**Cecilio HIDALGO, Plaintiff-Appellant,**

v.

**Otis R. BOWEN, Secretary of Health and Human Services of the United States, Defendant-Appellee.**

**No. 854, Docket 86–6095.**

United States Court of Appeals, Second Circuit.

Argued Feb. 24, 1987.

Decided June 26, 1987.

Annette De Palma, New York City (Kalman Finkel, Atty.-In-Charge, Legal Aid Society, Civil Div., Morton B. Dicker, Atty.-In-Charge, Kathleen Masters, Supervising Atty., John Kirklin, Director, Civil Appeals and Law Reform Unit, Nancy Morawetz, New York City, of counsel), for plaintiff-appellant.

Robin L. Greenwald, Asst. U.S. Atty., E.D.N.Y. (Andrew J. Maloney, U.S. Atty., E.D.N.Y., Robert L. Begleiter, Asst. U.S. Atty., E.D.N.Y., of counsel), for defendant-appellee.

Before KAUFMAN, VAN GRAAFEILAND and CARDAMONE, Circuit Judges.

CARDAMONE, Circuit Judge:

For 15 years when reviewing the grant or denial of disability benefit claims, we in this Circuit have consistently adhered to the treating physician rule. Yet, insofar as can be discerned from this record the Secretary of Health and Human Services has not heeded this message. Even though he avows that the administrative rule is in complete conformity with ours, the adjudicators—who decide these disability benefit claims—must live in an administrative "never-never" land because they appear never to have heard of the treating physician rule. Thus, because once again this rule was totally ignored by an administrative law judge when denying disability benefits to a claimant, we reverse the administrative decision.

## I PROCEEDINGS BELOW

The facts and proceedings below may be succinctly stated. Cecilio Hidalgo, a 56–

year-old claimant, is a native of Puerto Rico who lives with his sister in Brooklyn, New York. With a limited education and speaking little English, he worked for 15 years until October 1982 as a wood cutter in a picture frame factory. Hidalgo states that he stopped working because of crippling arthritis in his left hand, shoulder, and knee. He filed an application on November 30, 1982 for Supplemental Security Income (SSI) benefits, pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–1383c. After a hearing an administrative law judge (ALJ) denied his claim, finding that his impairments did not significantly limit his physical ability to perform basic work activities. The Appeals Council of the Social Security Administration denied review.

On January 24, 1984 claimant instituted the instant action in the United States District Court for the Eastern District of New York (Bramwell, J.) pursuant to 42 U.S.C. § 405(g). The district court remanded his case for a supplemental hearing based on the injunction in *Dixon v. Heckler*, 589 F.Supp. 1494 (S.D.N.Y.1984), *aff'd*, 785 F.2d 1102 (2d Cir.), vacated — U.S. —, 107 S.Ct. 3203, 96 L.Ed.2d 690. After a hearing *de novo*, the same ALJ again found Hidalgo able to perform his past work and therefore not disabled. This decision was also adopted by the Appeals Council.

The Secretary thereafter moved in the district court for a judgment on the pleadings, and claimant cross-moved for a judgment reversing or, alternatively, remanding the Secretary's decision. Ruling from the bench on March 14, 1986, Judge Bramwell found the Secretary's decision supported by substantial evidence and free of legal error. Judgment was entered in favor of the Secretary and claimant's cross-motion was dismissed. From this judgment Hidalgo appeals.

## II CLAIMANT'S MEDICAL HISTORY

We turn first to the medical record. In October 1981 claimant was admitted for a week to Bellevue Hospital diagnosed as having gout in the upper and lower left extremities. Six months later—in April 1982—he entered Lutheran Medical Center complaining of asthma. Because he had filed a SSI claim in November 1982, the Department of Disability Services had Hidalgo examined in December 1982 by Dr. Harvey Shapiro. Dr. Shapiro, the Secretary's consultative physician, found that x-rays of claimant's left hand and both knees were negative, but concluded that claimant's impairment included "prolonged joint pain, probably secondary to degenerative arthritis."

In January 1983 Hidalgo consulted Dr. M.I. Contractor, his treating physician. Dr. Contractor diagnosed claimant as having arthritis of the knees and shoulder and a ten-year history of chronic bronchial asthma. Dr. Contractor found pain and stiffness in Hidalgo's shoulder and right knee. In a residual functional capacity report the treating doctor estimated that claimant can only continuously stand for one hour, sit for four hours, and lift and carry up to ten pounds. Dr. Contractor found that because of pain and stiffness in his knees and hands, Hidalgo has a limited range of motion and difficulty grasping, pushing, pulling, and doing fine manipulations with his hands. Beginning in March 1983 claimant was treated at the Sunset Park Family Health Center for pain in his hands, knees and ankles, although x-rays of these areas revealed no evidence at that time of any arthritic changes. On April 25, 1983 his left shoulder was x-rayed and found "normal".

About a year later in May 1984, x-rays taken of claimant's cervical and lumbosacral spine demonstrated narrowing of the C5–C6 intervertebral disc space. On May 28, 1984 he was admitted to Lutheran Medical Center for treatment of septic arthritis and aspiration of the right knee. He was discharged June 4, 1984 with a diagnosis of gouty arthritis.

In addition to Dr. Contractor, Hidalgo consulted another treating physician, Dr. Brigino, who examined him at least every two weeks and submitted clinical notes documenting his treatment during the period from October 3, 1983 through April 12,

1985. His October 3, 1983 report shows a diagnosis of bronchial asthma and arthritis and a finding of joint pains and bilateral wheezing. Dr. Brigino's clinical notes document the following findings: a three-week long episode of leg pain and swelling in the right knee and left wrist, a two-day history of swelling, redness and warmth in the left wrist, high uric acid levels in the blood, and three acute asthma attacks.

Hospital records and clinical notes also reflect degenerative arthritis. Doctors at Lutheran Medical Center's Medical Clinic found that Hidalgo suffers from cervical and lumbosacral radiculopathy. As already noted, the May 1984 x-rays taken of Hidalgo's cervical spine show degenerative changes at C–5 and C–6 with narrowed neural foramina (a nerve passage situated in the spinal axis). The x-rays also show a narrowing of the C–5 and C–6 intervertebral disc space with osteoarthritis bilaterally and paravertebral soft tissue swelling. X-rays of the lumbosacral spine show slight demineralization of the osseous structures and straightening of the lordotic curve in the lumbar spine. Doctors found tenderness in the C–7 and C–8 areas of the cervical spine, with pain in the middle back radiating to the lower spine. Hidalgo had no sensory response to pin-prick testing in the C–5, C–6, C–7 areas of his cervical spine, nor in the L–4, L–5 areas of his lumbosacral spine. The doctors also found that Hidalgo has weakness in his left upper and lower extremities with atrophied left forearm muscles and interosseous muscles and weakness in his hand flexors and extensors reflexes.

Examinations of Hidalgo's extremities revealed swollen, red, tender lateral feet, knees, and ankles with joint pain on motion and swollen hands and fingers, abnormally high uric acid content in blood samples; suprapatella effusion of the right knees requiring aspiration; increased temperatures of his lower extremities, and pain in both knees on manipulation. Bilateral x-rays of his knees showed effusion. Hidalgo's medical treatment includes periodic aspiration of his right knee, prescription medication, bed rest, and elevation of affected extremities. Thus, treating physicians

Contractor and Brigino's findings and diagnosis of claimant's degenerative arthritis of the left arm and wrist and the right knee were verified by x-rays and clinical hospital reports.

In the first hearing decision dated October 11, 1983 the ALJ found that Dr. Contractor's clinical findings revealed arthritis of the knees and shoulders. Yet, the ALJ nonetheless found that claimant did not have an impairment sufficiently severe to preclude work-related activities. The Supplemental Hearing held before the same ALJ on January 9, 1985 resulted in a decision dated April 10, 1985. The Secretary's medical advisor, Dr. Richard Wagman, testified at this supplemental hearing, basing his opinion solely on the medical evidence in the record at that time. Dr. Wagman had neither Dr. Brigino's medical records, nor the Lutheran Hospital reports just recited, nor did he examine or see Hidalgo. His testimony is contrary to all the other medical opinions in the record. He disagreed with the treating doctors' diagnoses of arthritis, finding no evidence to support them. Dr. Wagman stated that Hidalgo had recovered from what Wagman termed gout, with no residual effects.

At the time of the Supplemental Hearing, claimant was seeing Dr. Shaw (apparently in the same medical office as Dr. Brigino) twice a month for medication to obtain relief for arthritis pain. Nonetheless, crediting only Dr. Wagman's testimony, the ALJ found that claimant's many allegations of disability were not documented by objective medical findings and concluded that claimant could perform his previous work as an operator of a wood-cutting machine. That determination was adopted as the final decision of the Secretary.

## III TREATING PHYSICIAN RULE

### A. *Its History in This Circuit*

It has been our rule for the past 15 years that the expert opinion of a claimant's treating physician regarding his "medical disability, i.e. diagnosis and nature and degree of impairment, is ... binding on the fact-finder unless controverted by substan-

tial evidence." *Schisler v. Heckler,* 787 F.2d 76, 81 (2d Cir.1986). During these years we have seen the rule consistently misapplied. In fact, two years ago we observed that the cases in which we have reversed the denial of benefits due to the ALJ's failure to apply properly the treating physician rule are "almost legion." *De Leon v. Secretary of Health and Human Services,* 734 F.2d 930, 937 (2d Cir.1984).

"Legion" should no longer be modified by "almost." We have relied upon the treating physician rule in 23 cases in which the administrative decision denying disability benefits has been either reversed or remanded. *See Johnson v. Bowen,* 817 F.2d 983 (2d Cir.1987); *Havas v. Bowen,* 804 F.2d 783, 785–86 (2d Cir.1986); *Stieberger v. Bowen,* 801 F.2d 29, 37 (2d Cir.1986); *Schisler,* 787 F.2d at 81–84; *De Leon,* 734 F.2d 930, 934–36; *Bluvband v. Heckler,* 730 F.2d 886, 892–93 (2d Cir.1984); *Aponte v. Secretary of Health and Human Services,* 728 F.2d 588, 591 (2d Cir.1984); *Ferraris v. Heckler,* 728 F.2d 582, 585–87 (2d Cir.1984); *Fiorello v. Heckler,* 725 F.2d 174, 176 (2d Cir.1983); *Donato v. Secretary of Health and Human Services,* 721 F.2d 414, 419 (2d Cir.1983); *Rivera v. Schweiker,* 717 F.2d 719, 723 (2d Cir.1983); *Varela v. Secretary of Health and Human Services,* 711 F.2d 482, 485 (2d Cir. 1983) (per curiam); *Carroll v. Secretary of Health and Human Services,* 705 F.2d 638, 643 (2d Cir.1983); *Echevarria v. Secretary of Health and Human Services,* 685 F.2d 751, 756 (2d Cir.1982); *Aubeuf v. Schweiker,* 649 F.2d 107, 114 (2d Cir.1981); *Hankerson v. Harris,* 636 F.2d 893, 896 (2d Cir.1980); *Parker v. Harris,* 626 F.2d 225, 232–33 (2d Cir.1980); *Singletary v. Secretary of Health, Education and Welfare,* 623 F.2d 217, 219 (2d Cir.1980); *Eiden v. Secretary of Health, Education and Welfare,* 616 F.2d 63, 64 (2d Cir.1980); *McLaughlin v. Secretary of Health, Education and Welfare,* 612 F.2d 701, 704–05 (2d Cir.1980); *Alvarado v. Califano,* 605 F.2d 34, 35 (2d Cir.1979) (per curiam); *Bastien v. Califano,* 572 F.2d 908, 912 (2d Cir.1978); *Gold v. Secretary of Health, Education and Welfare,* 463 F.2d 38, 42–43 (2d Cir.1972).

We cite these cases to emphasize how often the rule has been expounded, and also to indicate some sense of frustration at how little, if any, impact our decisions have had on the Secretary and his administrative fact-finders. This case illustrates the point. Had the treating physician rule been applied in this case, the result would have been different. Doctors Contractor, Shaw, and Brigino who treated Hidalgo all diagnosed him as having degenerative arthritis. The May 1984 x-rays confirmed this diagnosis, as did the atrophy of the upper left-arm of this left-handed claimant.

### B. *Medical Opinion of Non-Examining Physician May Not Override the Rule*

A corollary to the treating physician rule is that the opinion of a non-examining doctor by itself cannot constitute the contrary substantial evidence required to override the treating physician's diagnosis. *See Havas,* 804 F.2d at 786; *Strickland v. Harris,* 615 F.2d 1103, 1109 (5th Cir.1980); *Martin v. Secretary of Health, Education and Welfare,* 492 F.2d 905, 907–08 (4th Cir.1974); *Landess v. Weinberger,* 490 F.2d 1187, 1190 (8th Cir.1974); *Mefford v. Gardner,* 383 F.2d 748, 759 (6th Cir.1967).

### C. *Applying the Treating Physician Rule*

On appeal, we review the administrative record to decide whether there is substantial evidence to support the Secretary's determination that claimant is not disabled. *See Valente v. Secretary of Health and Human Services,* 733 F.2d 1037, 1041 (2d Cir.1984). We must consider here whether substantial evidence supports the ALJ's decision that claimant could return to his past employment. We conclude that the ALJ's finding that Hidalgo could return to his past employment is not supported by substantial evidence because it ignored the weight required to be given to the views of the medical experts who were actually treating the claimant. The credible medical evidence before the ALJ completely precluded a finding that the claimant could perform his past employment.

Claimant testified that his past work as a frame assembler required him to push 15 foot long planks of wood, each weighing up to 20 pounds through a table cutting machine. The weakness of his left arm made this impossible. Further, he stated that the degenerative arthritic condition of his left arm and wrist left him without the necessary dexterity and fine manipulative ability to assemble frames. To make up for this lack, he was asked to do heavier tasks, such as lifting, carrying, and storing the bundles of wood that weighed up to 60 pounds each. He quit his employment because he was equally unable to perform this work.

The government vocational expert stated that the lifting of bundles of wood in a large shop was not work that claimant would be required to perform, and that claimant would only need to perform the lighter work of cutting the wood to be made into picture frames. The government vocational expert conceded that in order for Hidalgo to perform the "light" work to which he said claimant could return, claimant would need to stand for six hours a day and have the full use of both hands.

As we noted above, the primary treating physician, Dr. Contractor, concluded that Hidalgo suffered from arthritis and asthma and as a result can stand continuously for only one hour, sit continuously for only four hours and lift and carry only up to ten pounds. Because of the pain and stiffness in Hidalgo's knees and hands, he has a limited range of motion and difficulty grasping, pushing, pulling, and doing fine manipulations with his hands. The medical diagnosis of arthritis and asthma were confirmed by other treating physicians and by clinical evidence.

Instead of accepting the medical diagnosis of the treating physicians, the ALJ improperly relied exclusively on the testimony of Dr. Wagman, the Secretary's medical advisor. Although Dr. Wagman never examined the claimant, he concluded on the basis of the medical records of the examining physicians that the claimant did not suffer from arthritis. As stated above, under the treating physician rule this testimony, by itself, does not constitute evidence sufficient to override the treating physician's diagnosis. Moreover, Dr. Wagman did not have before him the complete medical records of the claimant. One lengthy record exhibit not available to him at the time of the hearing contained clinical findings confirming the treating physician's diagnosis; this may have altered Dr. Wagman's conclusions.

Thus, the evidence relied upon by the Secretary was not sufficiently substantial to override the treating physician's assessment of Hidalgo's ability to perform those tasks found to be required of a frame assembler. For this reason, we find no substantial evidence in the record supporting the Secretary's conclusion that Hidalgo can perform his past work. We therefore remand to the Secretary for a determination of whether Hidalgo "cannot ... engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A) (1982 & Supp. III 1985).

D. *Secretary's Failure to Apply the Rule*

There remains to be considered what we view as a troublesome problem revealed by the Secretary's pattern of behavior in these cases. In *Schisler*, 787 F.2d 76, a panel of this Court spent considerable time at oral argument attempting to ascertain, first, what was the Secretary's policy regarding the treating physician rule and, second, what, if any, instructions the Secretary had given to the fact-finding ALJs in this regard. With respect to the former question, counsel for the Secretary stated that it was clear that the Secretary's rule was " 'the same as the second circuit rule.' " *Id.* at 83. This statement was accepted by the *Schisler* panel "at face value." *Id.* at 84. The panel concluded that the Secretary had in fact accepted the treating physician's rule as its own and "has not deliberately misstated its position" in order to relitigate the same proposition again and again. *Id.* But with respect to the second question, the Secretary acknowledged through counsel that its adjudicators had not been ad-

vised of the rule and so the panel directed the district court on remand to order the Secretary to "state in relevant publications to be determined by the district court that adjudicators at all levels, state and federal, are to apply the treating physician rule of this circuit." *Id.*

In *Stieberger,* 801 F.2d 29 another panel of this Court after reciting and relying on the above, vacated a preliminary injunction granted by a district court judge that would have barred the Secretary from denying or terminating disability benefits under administrative policies inconsistent with the physician treating rule of this Circuit. *Stieberger* cautioned that any indication that the order issued to the Secretary on remand in *Schisler* has not been followed will be sufficient reason to provide injunctive relief. *Id.* at 38.

Most recently in *Havas,* 804 F.2d 783 the history of the Secretary's failure to advise its adjudicators of the rule was repeated and emphasized by the ALJ's obvious ignorance of the Secretary's adoption of the treating physician rule. We need not dwell at length on the Secretary's apparent pattern of behavior which reveals itself in Janus-faced fashion by avowals of adherence to a rule that his actions contradict.

We say "apparent" because although there is nothing before us to suggest that the treating physician rule has been in fact circulated by the Secretary to the administrative law judges, it is true that *Schisler* was handed down on April 2, 1986, one year after the supplemental hearing before the ALJ in this case. Under the circumstances therefore this panel will retain jurisdiction of this case and in the meanwhile direct counsel for the government to file with the Court within two weeks of the date of this opinion an affirmation by the Secretary that he has taken steps to comply with our order in *Schisler* to circulate the treating physician rule to the ALJs.

### IV CONCLUSION

The order appealed from is reversed and the matter remanded to the district court with directions to remand it to the Secretary to conduct such further proceedings on the merits as necessary consistent with this opinion.

VAN GRAAFEILAND, Circuit Judge, concurring in part and dissenting in part:

I concur in that portion of my colleagues' decision which directs that the case be remanded to the Secretary for further proceedings. I do so, not because I endorse my colleagues' summary of the medical record, with much of which I disagree, but because I believe the record should be amplified concerning the existence vel non of disabling symptoms during the intervals between appellant's episodic attacks of gout. I dissent from that portion which "retains jurisdiction" of the case and directs Government counsel to file with the Court within two weeks an affirmation that the Secretary has taken steps to comply with "our order in *Schisler.*"

In *Richardson v. Perales,* 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971), the Court laid to rest any uncertainty that theretofore may have existed concerning the admissibility and probative value of written medical reports. The Court held that "despite the presence of opposing direct medical testimony and testimony by the claimant himself, [such reports] may constitute substantial evidence supportive of a finding by the hearing examiner adverse to the claimant...." *Id.* at 402, 91 S.Ct. at 1428. The Court continued, "The courts have reviewed administrative determinations, and upheld many adverse ones, where the only supporting evidence has been reports of this kind, buttressed sometimes, but often not, by testimony of a medical adviser...." *Id.* at 405, 91 S.Ct. at 1429. The Court pointed out that medical advisers are used in approximately 13 percent of disability claims, and it approved of that practice. The purpose of such advisers, said the Court, is to explain complex medical problems in terms understandable to the layman-examiner. *Id.* at 408, 91 S.Ct. at 1430.

The medical records in the instant case establish beyond dispute that appellant suffered from periodic attacks of gout. This is an illness which results from an excess

of uric acid in the blood and which causes painful "gouty arthritis" in affected joints. However, it is an illness that comes and goes, and the intervals between attacks are usually symptom free. "With remission urinary excretion of uric acid becomes normal again and recovery is usually complete, and the affected joint regains full function. An asymptomatic period then follows. The duration of these intervals may be months or may be even years." A. Johnston & L. Caswell, *Gout,* in 1C R. Gray, *Attorneys' Textbook of Medicine* ¶ 19G.43, at 19G–11.

Gouty arthritis should not be confused with either Rheumatoid Arthritis or Osteoarthritis (Degenerative Joint Disease). "In contrast to other forms of arthritis, the treatment is relatively effective and results can be dramatic." *Id.* ¶ 19G.80, at 19G–25. "Local symptoms and signs eventually regress and joint function returns to normal." The Merck Manual Fourteenth Edition 1201 (1982).

Appellant was diagnosed as having "gouty arthritis" at the Bellevue Hospital in 1981, at the Lutheran Medical Center in 1982 and again in 1984. In 1985, Dr. Brigino also diagnosed appellant's problem as "gouty arthritis". During all this time, x-rays of appellant's hands, knees, ankles and shoulder were negative for degenerative arthritis.

Dr. Wagman, who was the ALJ's Medical Adviser, simply summed up what already was in the record, namely, that appellant was having periodic attacks of gout and that repeat x-rays of his joints showed no evidence of significant arthritic changes or chronic damage to joints such as one would expect from a chronic arthritic condition. Dr. Wagman then explained the well-accepted symptomatology of gout, *i.e.,* that between attacks, the victim can function adequately.

Because I agree that the case be remanded to the Secretary, there is little to be gained in discussing in detail where my view of the facts differs from that of my colleagues. However, in fairness to Dr. Wagman, I must respectfully note my disagreement with the statements in the majority opinion that both Dr. Contractor and

Dr. Brigino found that appellant had "degenerative arthritis of the left arm and wrist and the right knee [which] were verified by x-rays" and that Dr. Wagman's testimony "is contrary to all the other medical opinions in the record."

I must also respectfully note that the degenerative changes in appellant's spine, a condition that "is present to some degree in most people after fifty years of age", L. Sante, *Principles of Roentgenological Interpretation* 177 (1952), was not the subject of any recorded findings or complaints until May 1984, one year after the "attending physicians" stated that appellant was suffering from "recurrent" attacks of asthma and arthritis. Moreover, the May 24, 1984 hospital record dealing with appellant's spinal condition refers to an unidentified automobile accident which, so far as I can determine from the poorly copied hospital records, was never referred to prior to that date.

For the foregoing reasons and others hereafter discussed, I conclude that this is not a proper case for this Court to take up the cudgels on behalf of the so-called attending physicians rule. This "rule", if it may be properly called such, was adopted for this Circuit in the seminal case of *Gold v. Secretary of HEW,* 463 F.2d 38, 42 (2d Cir.1972), where we said:

> The expert opinions of plaintiff's treating physicians as to plaintiff's disability are binding upon the referee if not controverted by substantial evidence to the contrary.

The rule, with minor modifications, was adhered to in subsequent decisions of this Court. However, there came a time when we were not sure that the Secretary was proceeding in accordance with it. Accordingly, in *Schisler v. Heckler,* 787 F.2d 76 (2d Cir.1986), we directed the district court to issue an order directing the Social Security Administration to "state in relevant publications to be determined by the district court that adjudicators at all levels, state and federal, are to apply the treating physician rule of this circuit." *Id.* at 84. Although we left to the district court the task of fashioning the precise order to ac-

company the remand, *id.* at 85, we defined the rule as follows:

> That rule provides that a treating physician's opinion on the subject of medical disability is binding on the factfinder unless contradicted by substantial evidence. "Medical disability" refers to medical questions of diagnosis and nature and degree of impairment. In addition, the treating physician's opinion on the subject of medical disability is entitled to some extra weight because the treating physician is usually more familiar with a claimant's medical condition than are other physicians, although resolution of genuine conflicts between the opinion of the treating physician, with its extra weight, and any substantial evidence to the contrary remains the responsibility of the fact-finder.

*Id.*

I am informed that the district court has held hearings and received legal memoranda in preparation for the carrying out of its task, but that an order has not yet issued. Nonetheless, this panel now demands an affirmation from the Secretary that he is complying with our order in *Schisler.* In the process, we add a "corollary" to the rule as enunciated in *Schisler* to the effect that the opinion of a non-examining doctor "by itself" cannot constitute the contrary substantial evidence required to override the treating physician's diagnosis. This corollary was taken from a statement of dictum in *Havas v. Bowen,* 804 F.2d 783, 786 (2d Cir.1986), that the opinions of non-examining physicians "in themselves" cannot constitute substantial evidence overriding the opinions of examining physicians. Assuming that the dictum in *Havas* should be treated as binding precedent, it is difficult, if not impossible, to conceive of a situation in which a non-examining doctor would fashion an opinion out of thin air. As in the instant case, the non-examining doctor must of necessity base his opinion on hospital records, medical reports, x-rays, etc. Since such reports, standing alone might "constitute substantial evidence supportive of a finding ... adverse to the claimant", *Richardson v. Perales, supra,* 402 U.S. at 402, 91 S.Ct. at 1428, testimony by a non-examining medical expert based on those reports should be worthy of even greater weight. Assuming that a situation could ever be presented in which the majority's so-called "corollary" might be applicable, this is not such a situation.

I suggest that the proper procedure would be to permit the district court in *Schisler* to issue its order and then have the order come up to this Court in the customary manner for review. *See Stieberger v. Bowen,* 801 F.2d 29, 36–38 (2d Cir.1986). If this were done, further refinements of the rule might well be made. For example, the rule makes no reference to either the honesty or the caliber of the attending physician whose diagnosis, we say, must be accepted. One need only examine the numerous actions brought against doctors under 18 U.S.C. § 1001, *e.g., United States v. Greber,* 760 F.2d 68 (3d Cir.), *cert. denied,* 474 U.S. 988, 106 S.Ct. 396, 88 L.Ed.2d 348 (1985), *United States v. Abadi,* 706 F.2d 178 (6th Cir.), *cert. denied,* 464 U.S. 821, 104 S.Ct. 86, 78 L.Ed.2d 95 (1983), to realize that doctors are not immune from temptation to stray from the straight and narrow. The ever-growing body of malpractice litigation indicates that they likewise are not immune from medical error. This Court should carefully consider whether it can or should direct the Secretary to accept the word of dishonest or incompetent doctors as binding. *See Cummins v. Schweiker,* 670 F.2d 81, 84 (7th Cir.1982). This Court might also want to decide whether the testimony of either a non-examining or a non-treating physician should be rejected out of hand where it does not stand alone but is instead based upon and supported by competent medical evidence in the record such as x-rays. *See Richardson v. Perales, supra,* 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842; *Ransom v. Heckler,* 715 F.2d 989, 993–94 (5th Cir.1983); *Lewis v. Schweiker,* 720 F.2d 487 (8th Cir.1983); *Oldham v. Schweiker,* 660 F.2d 1078, 1084–85 (5th Cir. 1981); *Lawson v. Secretary of HHS,* 688 F.2d 436, 438 (6th Cir.1982). In any event, I believe we err in injecting ourselves into issues presently being resolved in other

litigation in district court. If we insist on immediate results, the proper way to secure them is through action by that court.